UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 15-20187-tnw |
| JAMOS FUND I, LP, | CHAPTER 11 |
| DEBTOR. | HON. TRACEY N. WISE |

| | |
|---|---|
| IN RE: | CASE NO. 1-20186-tnw |
| JAMOS CAPITAL, LLC, | CHAPTER 11 |
| DEBTOR. | HON. TRACEY N. WISE |

### OMNIBUS OBJECTION TO JAMOS CAPITAL, LLC'S AND JAMOS FUND I, LP'S EXPEDITED MOTIONS FOR INTERIM USE OF CASH COLLATERAL

Capital One, National Association ("Capital One"), by its attorneys, **MCGLINCHEY STAFFORD PLLC** and **FROST BROWN TODD LLC**, respectfully files this objection to the Expedited Motion for Interim Use of Cash Collateral [Doc. 7] filed by the Debtor herein, Jamos Capital, LLC, as well as the Expedited Motion for Interim Use of Cash Collateral [also Doc. 7] filed by Jamos Fund, LP, in its separate bankruptcy (Case No. 15-20187), (collectively, the "Motions").[1] Capital One states the following in support of its objection:

#### Overview and Background

1. Jamos Capital, LLC ("Jamos Capital") is the general partner of Jamos Fund I, LP, ("Jamos Fund"). Both companies filed voluntary petitions under Chapter 11 of the United States

---

[1] In connection with the filing of their Motions, Jamos Capital, LLC and Jamos Fund I, LP also independently filed a "Joint Motion for Order Authorizing Joint Administration," [Doc. 6 in both cases], wherein they seek to combine the administration of the two estates. In anticipation of the consolidation of their cases, Capital One files this Omnibus Objection to both Motions.

Bankruptcy Code in this District on February 12, 2015. Both Debtors remain in possession and control of the property of their estates as "debtors in possession."

2. On February 13, 2015, this Court entered Chapter 11 Operating Orders governing the interim operation of the Debtors' business [Doc. 5 in each case]. The Debtors are engaged in business activities, which relate primarily to the collection and enforcement of tax liens.

3. In the Motions, the Debtors seek authority under 11 USC § 363 to use cash and certain account receivables to operate the Debtors' business so they may "ensure continued ongoing operations and to protect and preserve the value of the Debtor's assets and its operations."

4. As discussed more fully below, Capital One objects to the Debtors proposed use of cash collateral. Despite repeated requests (over many months), the Debtors and their principals have refused to provide Capital One with basic data, information, records and, more generally, access to its collateral. Capital One additionally is aware of facts which make it concerned about the status of its collateral and the Debtor's use of the same.

### The Loan and Collateral

5. As mentioned in the Motions, and as explained more fully below, Capital One provided asset based financing to Jamos Fund and its two subsidiaries, Jamos Florida Fund I LLC ("Jamos FL") and Jamos Fund I KY, LLC ("Jamos KY"), to purchase various tax liens in Florida and Kentucky (the "Loan"). Jamos Capital, as the general partner of Jamos Fund, guaranteed the Loan, as did several equity owners of Jamos Capital and Jamos Fund.[2]

6. The Loan is evidenced by various documents, all of which will be fully accounted for and explained when Capital One files it proof of claim. For purposes of the interim relief

---

[2] Namely Greg Martini, Thomas R. Shepard, and Steven R. Sutermeister. Martini and Shepard continue to guaranty the Debtor's Loan obligations to Capital One.

being sought, however, suffice it to say that Capital One has a security interest the following assets of Jamos Fund:

> All accounts, chattel paper (whether tangible or electronic), instruments (including promissory notes), inventory, documents, supporting obligations, any other contract rights or rights to payment of money, insurance claims and proceeds, and all general intangibles, (including all payment intangibles), including without limitation all Tax Liens, account ledgers, books, records, files, computer disks and software and all rights thereto.
>
> (collectively, the "Tax Lien Collateral").

Attached hereto and incorporated herein by this reference as Exhibit "A" are copies of the relevant loan documents (Security Agreement (Assets), Credit Agreement, and Note) evidencing Capital One's security interest in the Tax Lien Collateral.

7. Capital One perfected its security interest in the Tax Lien Collateral by filing various UCC-1 financing statements in the appropriate jurisdictions for each grantor.[3] Copies of these UCC-1 financing statements are collectively attached hereto and incorporated herein as Exhibit "B."

8. As additional security for the Loan, Jamos Capital executed a "Guaranty Agreement," pursuant to which Jamos Capital unconditionally guaranteed the prompt and punctual payment and satisfaction of all "Indebtedness" owed to Capital One (as that term is defined therein) (the "Jamos Capital Guaranty"). A copy of the Jamos Capital Guaranty is attached hereto and incorporated herein by this reference as Exhibit "C."

9. Jamos Capital did <u>not</u> grant Capital One a security interest in any tax liens. Indeed, under the structure of the Loan, Jamos Fund (and its subsidiaries, Jamos FL and Jamos

---

[3] The Debtors acknowledge in their Motions that Capital One has a perfected security interest in the Tax Lien Collateral.

KY) would purchase and own all of the tax liens, which is why only they executed the Security Agreement.

10. Jamos Fund, Jamos KY, and Greg D. Voss, PLLC ("Voss")[4] also executed a certain "Pledge and Security Agreement," dated May 6, 2011 (the "Voss Pledge Agreement") in favor of Plaintiff, which pledged to Plaintiff certain deposit accounts identified therein (the "Voss Collection Accounts"), and gave plaintiff a security interest in the same, in order to secure the payment of the Indebtedness (as defined therein). A copy of the Voss Pledge Agreement is attached hereto and incorporated herein by this reference as Exhibit "D."

11. The Loan was governed in part by a Credit Agreement (attached as part of Exhibit A), wherein Capital One agreed to make advances to Jamos Fund, provided that the aggregate amount of such advances did not exceed the lesser of (i) the maximum dollar amount of the Note (initially, $20,000,000.00) or (ii) the Borrowing Base, as defined in the Credit Agreement (the "Borrowing Base"). As an asset based loan, the "Borrowing Base" would fluctuate naturally up or down depending on the amount of "eligible" assets (in this case Tax Lien Collateral) owned by the Borrower at any given time. *See generally Article I and II of the Credit Agreement.*

12. The Credit Agreement provided that if the total advances exceeded the Borrowing Base, creating an overadvance, the amount of the overadvance would become due and payable immediately upon demand by the Plaintiff. *Credit Agreement, at Sections 2.1(d) and 2.3.*

13. Additionally, under Articles IV, VI, and VII of the Credit Agreement, Jamos Fund, Jamos KY, Jamos FL, and Jamos Capital (collectively the "Jamos Entities") each agreed to provide certain financial information to the Plaintiff at various intervals (or as requested) and additionally agreed to comply with certain financial covenants, all of which were designed to

---

[4] The Debtors retained Voss to assist with the collection of the Tax Lien Collateral, as discussed more fully below.

-4-

monitor and measure the financial health of the Jamos Entities as well as the Tax Lien Collateral. *Credit Agreement, at Articles IV, VI and VII.*

### Events of Default and Efforts to Resolve the Same Amicably.

14. In July of 2014, Jamos Fund provided information to Capital One indicating that the Tax Lien Collateral was comprised of a portfolio of over five thousand (5,000) tax lien certificates with stated principal lien balances totaling $6,084,272.00.[5]

15. The nature of the Tax Lien Collateral was (and is) very dynamic. While the original tax lien certificate itself evidences the legal right of the holder to enforce and collect on the same, applicable law permits tax lien certificate holders to recover various costs, late fees, and interest from land owners who choose to repay their outstanding tax lien over a period of time. Additionally, if a tax lien is not paid, the tax lien holder may institute foreclosure proceedings in an appropriate jurisdiction to collect the outstanding tax lien amount (plus attorneys' fees and costs). In either scenario, circumstances are created such that third parties (land owners, servicing companies, and/or attorneys processing foreclosures), become obligated to make payments and/or remit net proceeds from tax lien servicing activities to the tax lien holder.

16. Suffice it to say, these layers of activity required constant management by the Jamos Entities and theoretically increased the redemptive value of the Tax Lien Collateral. In fact, as of July 31, 2014, the Jamos Entities claimed that the Tax Lien Collateral had a total

---

[5] Upon information and belief, the Jamos Entities serviced this volume of tax liens with the assistance of Lien Collection Services, LLC, ("LCS"), which was directly responsible for managing and overseeing the monthly repayment of outstanding tax liens. Jamos Capital is the sole member of LCS. Per public records, LCS shares the same address as the Debtors and has the same principal, namely Patrick Weir. Upon information and belief, the Jamos Entities also employ five law firms to manage and prosecute any tax lien foreclosures. At this time, neither Debtor has sought to assume the contracts pursuant to which Lien Collection Services and/or the law firms provide their tax lien collection services to the estate. The terms of LCS's and several of the law firms' retention remains secret. Despite repeated requests by Capital One for the Debtors to provide those documents (beginning in August 2014), Jamos Fund and/or Jamos Capital have refused to comply.

redemptive value of $12,230,558.00, once all accrued interest, late fees, attorneys' fees and other charges were added to the original tax lien amounts. As discussed below however, not all of that Tax Lien Collateral was "eligible" for purposes of calculating the appropriate "Borrowing Base" under the Credit Agreement. Indeed, some portion of that redemptive value was not (and is not) likely to be "collectible."

17. In any event, Capital One's reporting and monitoring requirements mentioned above were designed to ensure that the Tax Lien Collateral was being managed competently and that the Tax Lien Collateral remained secure, not to mention legally and economically viable.

18. In late 2013, it became apparent that the Jamos Entities were struggling to comply fully with their reporting requirements under the Loan Documents. Capital One approached the Jamos Entities about these deficiencies and, in an attempt to address and rectify the same, the Jamos Entities informed Capital One that they had decided to remove Mr. Gregory F. Martini as President of Jamos Capital and replace him with Mr. Patrick Weir ("Weir").

19. Weir would hold the title of Chief Executive Officer of Jamos Capital and, as such, attempt to "turnaround" the operations of the Jamos Entities.

20. Between November 2013 and July 2014, in connection Mr. Weir's takeover of the Jamos Entities, Capital One and the Jamos Entities negotiated several modifications to the "Borrowing Base" under Credit Agreement. The Jamos Entities sought these modifications largely due to the age of some of its existing Tax Lien Collateral; without any expansion of "eligibility" requirements, the Jamos Entities would experience a significant overadvance under the Credit Agreement.

21. As negotiations progressed, the Jamos Entities actively marketed the existing Florida portfolio of Tax Lien Collateral in order to sell the same. A sale of that Florida Tax Lien

Collateral occurred in March 2014. While the sale of the Florida Tax Lien Collateral did alleviate some of the overadvance problems experienced by the Jamos Entities, it did not fully cure the same.

22. Capital One continued to work with its Borrower however and, eventually, the modifications to the Borrowing Base were formalized on July 8, 2014 in a "Second Amendment to Credit Agreement" (the "Amended Credit Agreement"), a copy of which is attached as part of Exhibit "A."

23. Under the Amended Credit Agreement, the "eligibility" requirements of the Tax Lien Collateral were expanded, and Capital One additionally agreed to take into account, among other things, cash being held in the Voss Collection Accounts (then approximating $434,000.00).[6]

**Continued Events of Default and Capital One's Enforcement of the Loan Documents.**

24. On August 4-6, 2014, as contemplated by Loan Documents, Capital One performed a field audit at the Debtors' principal offices in Cincinnati, Ohio. During that audit, Capital One discovered serious discrepancies in how the Jamos Entities were accounting for "eligible" assets under the Amended Credit Agreement.

25. Around the same time, Capital One learned that over $400,000.00 in partial payment monies were missing from the Voss Collection Accounts. As of July 31, 2014, only approximately $5,000.00 remained in the Voss Collection Accounts. When questioned by Capital One about this discrepancy, the Jamos Entities were not able to account for these monies satisfactorily. To date, the Debtors have still not fully accounted for the whereabouts of these

---

[6] According representations made by the Debtors at the time, these monies constituted partial payments that had been made on the Tax Lien Collateral. The Debtors would retain partial payments in escrow until the tax lien associated with the same was paid in full. Once paid in full, expenses associated with the collection of the tax lien were to be paid and the net proceeds remitted to Jamos Fund.

escrow monies. Capital One has learned since that additional escrow monies also have not been accounted for.

26. Capital One sent various written demand and cure letters to the Jamos Entities regarding these and other reporting defaults.

27. During the interim, Capital One completed its review of the information obtained at the field audit and, based on the "corrected" figures contained in the Borrowing Base Certificate for 7/31/14, the aggregate principal amount of the outstanding Advances under the Loan exceeded the Borrower's Borrowing Base by the amount of $735,213.45 (the "Overadvance").

28. The Jamos Entities responded by making some payments on the Overadvance but, ultimately, it failed to repay the full outstanding balance of the Overadvance.

29. On October 16, 2014, after the Jamos Entities became non-responsive to the Plaintiff's requests, and due to additional Non-Monetary Defaults as well as the remaining, still outstanding Overadvance (then in the amount of $383,720.14), Capital One notified the Jamos Entities that an "Event of Default" had occurred under the Loan Documents, that default interest at a rate of 21.0% per annum was now accruing on all amounts owed under the Loan Documents, and that the Jamos Entities had five (5) days to cure the same (the "Notice of Default"). A copy of this Notice of Default is attached hereto and incorporated herein by this reference as Exhibit "E."

30. The Jamos Entities failed timely to cure the Overadvance and the Non-Monetary Defaults as required by the Notice of Default.

31. Nonetheless, on or about October 24, 2014, the Jamos Entities (through counsel), contacted Capital One and requested additional time to comply with the Notice of Default, based on assurances of cooperation and future compliance.

32. Negotiations continued in good faith until it became apparent that the Jamos Entities either were incapable of curing or were unwilling to cure the outstanding Overadvance (which based on the last provided Borrowing Base Certificate-September 2014, as corrected) had grown to $760,346.64.

33. Additionally, it became clear to Capital One that the Jamos Entities (lead by Weir) were unwilling to account for the proceeds missing from the Voss Collection Accounts or provide meaningful justifications for a variety of other expenditures, which were (or had been) draining the Jamos Entities of much needed operating capital.

34. Pursuant to Section 607 and Section 406 of Revised Chapter 9 (La.R.S. 10:9-101, et seq.),[7] other applicable law, and the Loan Documents, the Plaintiff notified third party account debtors (Lien Collection Services, LLC and the law firms employed by the Jamos Entities to prosecute the Tax Lien foreclosures) to make all payments on the Tax Lien Collateral directly to the Plaintiff (the "Account Debtor Notices"). Copies of these Notices are attached hereto and incorporated herein by this reference as Exhibit "F."

35. Prior to the filing of this case, Capital One also exercised its right to apply funds on deposit in accounts held by Jamos Entities and Voss, pursuant to the Security Agreement, the Jamos Capital Guaranty, the deposit agreements between each of the Jamos Entities and Capital One, and the Voss Pledge Agreement.[8]

---

[7] As evidenced by the Loan Documents, the Parties chose and agreed to apply the substantive law of Louisiana to the Loan.
[8] The total amount offset totaled $293,535.47 from accounts maintained by Jamos Capital, Jamos Fund and Greg D. Voss, PLLC. These amounts have been applied to the principal balance owed on the Loan.

36. On December 31, 2014, Capital One accelerated the Loan when it instituted a state court foreclosure action against the Jamos Entities,[9] wherein it sought (among other things) the appointment of a receiver to takeover possession of the Tax Lien Collateral and the management of the same.

37. A hearing on the appointment of that receiver was scheduled to occur the morning of February 13, 2015. However, on February 12, 2015, the Debtors sought relief under Chapter 11 of the Bankruptcy Code, effectively staying Capital One's state court foreclosure action.

### Debtors' Request for Use of Cash Collateral

38. As of the Filing date, the Debtors owe Capital One approximately $2,878,314.53, which amount is secured by the Tax Lien Collateral (the "Indebtedness").[10]

39. All payment intangibles from the Tax Lien Collateral, including any funds or cash generated therefrom in the Debtors' pre-petition or Debtor-In-Possession accounts, as well as, all cash to be generated from the sale and/or collection of the Tax Lien Collateral by the Debtor-in-Possession, constitutes cash collateral under 11 U.S.C. § 363 (the "Cash Collateral").

40. The Debtors' Motions acknowledge that Capital One has a first priority security interest in the Cash Collateral. Capital One does NOT consent to the use of those funds in connection with the Debtors' proposed continuation of business operations.

41. Acknowledging the application of 11 U.S.C. § 363 to its use of Cash Collateral, the Debtors contend that Capital One will be adequately protected because it is oversecured and because the Debtors propose (a) to grant Capital One replacement liens on all collateral acquired

---

[9] *Capital One National Association v. Jamos Fund I, LP, et al*, Case No. A1407572, Hamilton County Court of Common Pleas, State of Ohio.

[10] This amount represents the principal balance of the Loan, plus pre-petition late fees, contractual interest, and default interest. To the extent this Court makes a final determination that Capital One is oversecured, the amount of the Indebtedness will increase due to the continued accrual of interest, not to mention the significant amount of attorneys' fees and costs that Capital One has incurred (and will continue to incur) in enforcing its collateral remedies. Contractual and default interest per diem on the Loan is currently $1,662.54. 11 U.S.C. § 506(b).

-10-

by the bankruptcy estate post-petition, to the same extent and priority as such creditors held pre-petition, and (b) to make monthly payments to Capital One in the amount $25,000.00.

42. Other than providing an affidavit from Weir,[11] which summarily concludes that the value of the Tax Lien Collateral exceeds the amounts owed to Capital One, the Debtors provide no detail or accounting of the Tax Liens themselves, critical information that Capital One has been requesting (without success) from the Debtors since October 2014.

43. Indeed, not all Tax Liens are the same. While some have active and current payment streams,[12] many others do not because the tax debtors have either stopped payment, declared bankruptcy, or are making less than periodic partial payments on the same. When a tax debtor defaults on its repayment obligations, the Jamos Entities then must decide whether to institute foreclosure proceedings in order to recover the property. Those foreclosure tax liens take significant amounts of capital to liquidate; capital not only to pay the law firms and/or LCS to prosecute, but also to bid on the property when it is sold. Sometimes bidding on a property is not economically prudent, such as in cases where the value of the property purchased may not be sufficient to cover the total amount invested in the corresponding tax lien. In those cases, the redemptive value of the Tax Lien ends up being $0.00.

44. The impact of these variables on the overall value of the Tax Lien Collateral is illustrated by a simple review of Jamos Fund's Borrowing Base Certificates. According to the most recent Borrowing Base provided by Jamos Fund (September 30, 2014), Jamos Fund reported the Tax Lien Collateral as having a total value of $5,709,789.66 (principal amount of

---

[11] The Weir Affidavit was filed in support of the Debtors' Motions for expedited consideration on their various "first day" motions, [Doc. 10 in each case], (the "Weir Affidavit").

[12] As mentioned above, under applicable Kentucky law, tax debtors may repay outstanding tax liens over a period of time. In such circumstances, the Jamos Entities are essentially financing the tax debtors' repayment of their tax obligations. Such financing is subject to certain fees and charges that theoretically increase the value of such tax liens (assuming that the tax debtors do not default and the Jamos Entities are able to actually collect the same).

each lien plus administrative fees). Of that amount, almost one half of the liens ($2,513,291.10 to be precise) were "ineligible" under the Loan Documents because they were either too old (over 3 to 4 years), no longer collectible due to bankruptcies, and/or in some state of partial repayment. Put another way, only $3,196,498.56 in Tax Lien Collateral was "eligible" under the Loan Documents. Some portion of the Debtor's current portfolio of Tax Lien Collateral will similarly not be collectible. Much more information is needed before this Court or Capital One can determine the true value of the Tax Lien Collateral. A copy of the September 30, 2014 Borrowing Base Certificate is attached and incorporated herein by this reference as Exhibit "G."

45. Additionally, at this time, it is unclear whether Jamos Fund attempted to include the tax lien portfolio allegedly owned by Jamos Capital on its Borrowing Base Certificates. Capital One is investigating Jamos Capital's alleged ownership of Tax Lien Collateral, its prior representations regarding the Tax Lien Collateral, and reserves all rights with respect to the same.[13] Again, without a detail accounting of the Tax Lien Collateral, it is impossible to know whether Weir's valuation is reliable, accurate and/ or realistic.

46. It is equally unclear where the documents and/or electronic files evidencing these tax debtor payment obligations are being held, or under what circumstances they are being managed. For instance, the Debtors have not accounted for what it costs to collect on these tax liens. As noted above, the Debtors claim to engage LCS and various law firms to collect on the tax liens. Yet, the Debtors have not provided financial statements to Capital One since

---

[13] According to the last financial statement provided to Capital One (August, 2014), Jamos Capital did not disclose its ownership of any Tax Lien Collateral. Instead, it reported that it was owed $2,512,557.20 in accounts receivables from a third party, "Lien Servicing Company." It is not clear what "Lien Servicing Company" is at this time. Applying generally accepted accounting principles, it should not be LCS since LCS is a wholly owned subsidiary of Jamos Capital. Again, without any accounting, it is impossible to know whether Jamos Capital even owns Tax Lien Collateral, much less what that Collateral is actually worth. Capital One reserves all rights against the Debtors, their principals, and the guarantors under the Loan Documents while it investigates this (and other issues) further. A copy of the August, 2014 Financial Statement is attached here and incorporated herein by this reference as Exhibit "H."

September 2014 or copies of the controlling engagement and/or servicing agreements it has with those parties. Indeed, the Debtors have not even sought to assume its contracts with LCS and/or the law firms. As a result, Capital One does not know what amounts still may be owed to LCS and/or the law firms, what partial payment escrows those parties may be holding, or what tax liens those parties even are responsible for collecting. When asked for this information in the past, the Debtors have refused to provide it. Again, without a full accounting, it is impossible to rely on the Debtors' valuation, much less assess whether $25,000 monthly payments are appropriate under the circumstances.[14]

47. Further troubling is the fact that the Tax Lien Collateral only will continue to diminish as those Tax Liens are liquidated/collected. As Weir's Affidavit indicates, the Debtors are in process of liquidating the Tax Lien Collateral. The Debtors are not purchasing actively new tax liens to replenish their portfolio. As a result, it is impossible for the Debtors seriously to offer any "replacement" liens on new Tax Lien Collateral since no new collateral will exist.[15] Additionally, the Debtors' offer of replacement liens on the cash proceeds derived from the Tax Lien Collateral is based on the self-serving assumption that Capital One is oversecured; a determination (given the lack of reporting) which the Debtors have failed utterly to prove. *See In re Buttermilk Towne Center, LLC*, 442 B.R. 558 (6th Cir. (BAP) 2010).

48. In addition to the numerous reporting deficiencies noted above, and upon information and belief, LCS (owned by Jamos Capital) and several of the law firms working for the Debtors repeatedly have ignored the Account Debtor Notices (Capital One's attempts to

---

[14] As noted above, if Capital One is oversecured, the interest is accruing at a rate of $1,662.54 per day, or almost $50,000 per month, double the amount of adequate protection payments being offered by the Debtors.

[15] As noted previously, Jamos Capital has offered no evidence proving it actually owns any Tax Lien Collateral and, in fact, represented to Capital One that a third party owned the Tax Lien Collateral. Before any replacement liens can be offered on this "Jamos Capital Tax Lien Collateral," a full accounting musts be provided, including disclosure of when, how, and on what terms Jamos Capital acquired the same, as well as, complete data detail on the Collateral itself.

collect directly on the Tax Lien Collateral). This inherent conflict between LCS, the law firms and the Debtors regarding compliance and/or interference with Capital One's contractual remedies further sways against allowing the Debtors to utilize the Cash Collateral.

49.  The Monthly Operating Budgets attached to the Motions also lack any meaningful detail so as to allow Capital One (or this Court) to make an informed determination on the use of Cash Collateral. Specifically, Jamos Capital claims to be generating at least $60,000 per month for an "Administrative Fee," plus another $10,000 in "Management Fees." Jamos Fund pays both of these fees to Jamos Capital. Neither Debtor bothers to explain why these "fees" are paid or what happens to the fees once paid to Jamos Capital (perhaps LCS or Weir receives the fee). The same lack of detail poses similar "unknowns" for several other budgetary items.

50.  Perhaps most concerning about the Monthly Operating Budgets is that the Budgets attached to the Cash Collateral Motions (the "Cash Budgets") materially differ from the Budgets attached to the Debtors' Petitions and the Motions for expedited consideration of the "first day" motions (the "Petition Budgets").[16] Specifically, the Cash Budgets provide that Jamos Fund will pay a $60,000 "Administrative Fee" to Jamos Capital; the Petition Budgets have no such line item for that expense. The Cash Budgets state that Jamos Capital will spend $25,000 on "Legal, accounting and other professional fees"; the Petition Budget lists that same expense as costing only $10,000 per month. Again, no supporting data or backup was provided for any of these Budgets so it is unclear how the Debtors will account (if at all) for these discrepancies.

---

[16] The Petition Schedules are attached to the Voluntary Petitions filed in these cases. *See* Jamos Fund Voluntary Petition at 42; Jamos Capital Voluntary Petition at 47.

**Adequate Protection**

51. Section 361(3) of the Bankruptcy Code empowers the Bankruptcy Court to grant "*such other relief* . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." This language, added by the 1984 additions to the Bankruptcy Code, was intended "to indicate that the court may grant *other forms of adequate protection*, other than an administrative expense, which will result in the realization by the secured creditor of the indubitable equivalent of the creditor's interest in property." *Legislative Statements to 1984 Acts, 11 U.S.C. § 361* (emphasis added). Courts have found that, when making an adequate protection determination, the prior conduct of the Debtor may be relevant. *In re Colonial Center, Inc.*, 156 B.R. 452, 463 (Bkrtcy. E.D. Pa. 1993); *see also Matter of Mickler*, 9 B.R. 121, 123 (Bkrtcy. M.D. Fla. 1981) (In determining adequate protection, ". . .the conflicting interests of the parties which, by their very nature, are irreconcilable must be balanced according to the circumstances and the equities of the case.")

52. This Court's discretion to grant "other forms" of adequate protection is critical in this case because the Tax Lien Collateral (and the cash proceeds) are "highly volatile, subject to rapid dissipation, and requires special protective safeguards" such that *possession* of that Tax Lien Collateral is paramount to preserving (and ensuring) the value of the same. *See Mickler*, 9 B.R. at 123. Recognizing this reality, and as will be more fully proved at the hearings on these Motions, the Loan Documents grant Capital One the right to take immediate possession of the Tax Lien Collateral and fully administer/manage/preserve the same. Indeed, Capital One was in the midst of exercising that very remedy when the Debtors filed their Petitions for relief.

53. Given the Debtors attempts to avoid accountability and willingness to ignore their obligations under the Loan Documents, the only way to preserve the Tax Lien Collateral/Cash Collateral is for this Court to prohibit the Debtors from using the Cash Collateral and order the

Debtors immediately to segregate and deposit any Cash Collateral in their possession (or the possession of LCS) into an escrow trust account to be maintained at Capital One and controlled by Capital One pending the administration of this case. In addition, this Court should order the Debtors, LCS, and the law firms to turnover possession of the Tax Lien Collateral (and all supporting files, documents, data, and records) to Capital One and provide Capital One with reasonable access to the Debtors' business records (and the records of LCS and the law firms) so Capital One (and this Court) can ascertain the true status of the Tax Lien Collateral.

54.   Given LCS' deliberate noncompliance and the lack of any accounting for LCS' cost to the estate, LCS should be removed immediately as the Debtor's servicer and replaced with a third party and independent servicer, which all creditors (and this Court) can trust. To the extent LCS remains, then, to otherwise ensure cooperation of LCS and the law firms, this Court at the very least (in recognition of Capital One's contractual and legal rights to directly collect on the Tax Lien Collateral) should order LCS and the law firms to make any and all payments on the Tax Lien Collateral directly into an escrow trust account to be maintained at Capital One and controlled by Capital One pending the administration of this case.[17]

## Conclusion

55.   The failure to be forthcoming with this Court (and all of the creditors) calls into question the true purpose of the Debtors' request for use of Cash Collateral, not to mention the bankruptcies themselves. The Debtors are effectively in liquidation, the Debtors has not offered any meaningful adequate protection to Capital One, and there is a high probability that Capital One is under-secured in these bankruptcies. The Debtor should not be allowed to utilize Capital

---

[17] As set forth in Capital One's Limited Objections to the retention of Proposed Counsel and Proposed Account, Capital One does not consent to the use of its cash collateral to pay the retainer of Proposed Counsel or any other and further costs, fees and expenses of Proposed Counsel or Proposed Accountant or any counsel that may be retained to represent the Debtors in these chapter 11 cases.

One's Cash Collateral without providing more information on the specific source of the same and providing meaningful adequate protection to Capital One along the terms outlined above. Until such protection is offered, Capital One has not and will not consent to the Debtors utilizing Capital One's Cash Collateral. To that end, Capital One submits this objection and reserves all rights with regard to the actions or inactions of the Debtors, Weir, other principals/employees, LCS, the validity guarantors, the law firms, and others.

**WHEREFORE,** Capital One National Association, respectfully requests that this Court deny the Debtors' Expedited Motions for Interim Use of Cash Collateral and for such other and further relief as is appropriate.

Respectfully Submitted:

*/s/ E. Stewart Spielman*
E. Stewart Spielman, LA Bar Roll #28766
Rudy Cerone, LA Bar Roll #14137
**McGlinchey Stafford, PLLC**
301 Main Street, 14th Floor
Baton Rouge, Louisiana 70825
Telephone: (225) 383-9000
Facsimile: (225) 343-3076
sspielman@mcglinchey.com

-and-

Douglas L. Lutz (Ohio Bar No. 0064761)
**Frost Brown Todd LLC**
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
dlutz@fbtlaw.com

Adam R. Kegley, Esq.
**FROST BROWN TODD LLC**
250 West Main Street, Ste. 2800
Lexington, Kentucky 40507
Telephone: (859) 231-0000
Facsimile: (859) 231-011
akegley@fbtlaw.com


ATTORNEYS FOR CAPITAL ONE, NATIONAL
ASSOCIATION


### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **OMNIBUS OBJECTION TO JAMOS CAPITAL, LLC'S AND JAMOS FUND I, LP'S EXPEDITED MOTIONS FOR INTERIM USE OF CASH COLLATERAL** was served via ECF to the parties registered with the Court on February 18, 2015.

*/s/ Douglas L. Lutz*
CO-COUNSEL FOR CAPITAL ONE, NA